# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TOD BRABNER and TANIA C. BRABNER, | |
| Plaintiffs, | Civil No. 13-10324-FDS |
| v. | |
| JOAN P. CHOW, | |
| Defendant. | |

# MEMORANDUM AND ORDER
# ON DEFENDANT'S MOTION TO DISMISS

**SAYLOR, J.**

This is a dispute arising out of the alleged nonpayment of a family gift. Plaintiffs Tod Brabner and Tania Brabner are the son-in-law and daughter, respectively, of defendant Joan Chow. Proceeding *pro se*, they have filed a complaint alleging fraud, breach of fiduciary duty, breach of contract, promissory estoppel, conversion, and unjust enrichment. In substance, they contend that defendant reneged on a promise to give them €800,000 so they could purchase a house.

Defendant has moved to dismiss under Fed. R. Civ. P. 12(b)(2) and 12(b)(6), contending that this Court lacks personal jurisdiction over her and that the complaint fails to state a claim upon which relief can be granted. For the following reasons, the motion to dismiss will be granted.

I.   **Background**

   A.   **Factual Background**

The facts are summarized as set forth in the complaint.

   1.   **The Oral Promise and Trust**

Tania Brabner is the daughter of Joan Chow. Chow married Henry Portis, a citizen of the Netherlands, on July 11, 1974, in Amsterdam.

On May 19, 2000, at the family summer home in France, Chow and Portis promised Tania €800,000 so she could purchase and furnish her own house.[1] Chow and Portis said that the promised funds were segregated and earmarked in a UBS account. In addition, Chow and Portis allegedly created an oral trust according to the following terms: (1) they would open a seven-year trust fund with UBS, (2) by the end of the summer they would transfer €800,000 into that trust fund; (3) they would be responsible for the taxes on the fund; and (4) they would provide Tania the name of a UBS representative to contact in the event of their deaths.

On August 14, 2000, Chow and Portis created a trust (the "Crossroads Trust") with an account at UBS.

Portis died three years later, on August 28, 2003, in Belgium. As of August 31, 2003, the Crossroads Trust account had a balance of 1,692,012 CHF (Swiss francs).

Portis's will was executed in accordance with Belgian law. According to the executor, Portis's will did not mention the Crossroads Trust and did not bequeath any assets to Tania. His estate was valued at €7,807,598.03.

---

[1] Chow and Portis allegedly made the same promise to Tania's brother.

2

### 2. Tod and Tania Brabner's Marriage

On May 5, 2006, Tod Brabner and Tania were married in Great Barrington, Massachusetts. Chow allegedly refused to attend the marriage unless Tod signed a prenuptial agreement, or, alternatively, agreed to relinquish all legal claims to any house purchased with the promised €800,000. The couple refused, and Chow did not attend their wedding.

### 3. Depletion of the Crossroads Trust

On April 12, 2006, Chow withdrew €15,000 from the Crossroads Trust account. Over the next four years, she made thirteen separate withdrawals from the account totalling more than €450,000. On June 13, 2010, Chow transferred €700,000 from the Crossroads Trust account to one of her personal bank accounts, which she then used to purchase a life-insurance policy. Approximately €450,000 in the Crossroads Trust was lost in stock investments.

### 4. Communication Between Chow and the Brabners

On July 27, 2006, Chow renounced her United States citizenship at the American embassy in Belgium. The State Department approved her renunciation on August 28, 2006.

It appears that the Brabners resided in Massachusetts from at least 2006 to the present, and that Chow resided in Belgium (or possibly France). From 2006 to 2007, the Brabners repeatedly informed Chow, by telephone and e-mail, that they were purchasing high-quality household furnishings worth more than $100,000, in anticipation of receiving the €800,000 from the trust. On January 15, 2008, they called Chow to ask how they could collect the €800,000. Chow hung up on them, saying she did not want to talk about the issue by telephone or e-mail. The Brabners attempted to schedule a time and place to meet with Chow, but she refused to do so. On December 1, 2008, the Brabners called Chow again to ask about the €800,000. Chow

3

hung up after telling them the Crossroads Trust money was technically her money.

On December 25, 2008, Chow called the Brabners and told them she and Portis had always intended to give Tania €800,000 to buy a house. She said she would pay them the money in the form of three gift payments over the course of three years. She also said she would pay any United States gift tax on the gifts.

In 2009, Chow made a transfer of €50,000 into the Brabners' bank account. The Brabners received a signed letter dated January 16, 2009, confirming that transfer. In 2010, Chow made a second €50,000 transfer to the Brabners. She confirmed it with a signed letter dated March 25, 2010.

### 5. Tania Brabner's Pregnancy

On January 25, 2011, the Brabners called Chow to tell her they were expecting their first child to be born in September of that year. They also told her that Tod had recently earned his doctoral degree from Boston University, and that they planned to attend his commencement on May 22. Chow assured them she would make the final transfer from the trust to the Brabners in within a few months. She also said she would visit them and stay in their new home.

On February 7, Chow called the Brabners and offered them a separate €40,000 gift as a baby present to be used for monthly rent, utilities, and the purchase of a comprehensive family healthcare policy. (Chow eventually confirmed the terms of the gift in an e-mail sent to the Brabners on September 5, 2011.) On February 15, the Brabners received a signed letter from Chow dated February 8, which said the gift of €40,000 was forthcoming. That money was transferred to the Brabners soon after.

4

### 6. The Brabners' Search for a House

On April 15, 2011, Chow called the Brabners, telling them she would transfer €700,000 into their bank account within three or four weeks. By the end of April, the Brabners decided not to renew their lease on their home. They planned on staying in hotels throughout Massachusetts for the next month or two in order to better assess and identify the town where they wished to purchase a house. The Brabners decided not to renew their lease in reliance on Chow's promise to transfer them the final €700,000.

In May, Chow corresponded with the Brabners by telephone and e-mail about their plans to purchase a house. She also solicited professional brokerage advice from her older sister, and provided that advice to the Brabners in an e-mail on May 16.

On June 1, the Brabners told Chow they had moved all their personal possessions into storage. It cost them $2,087 for the move and $300 per month for storage. They also told Chow they planned on staying at hotels for the next two months to better assess and identify the town in which they wanted to live.

On June 15, the Brabners e-mailed Chow, telling her they were negotiating the purchase of a house in Petersham, Massachusetts. The asking price of that house was $795,000. In July, the Brabners repeatedly told Chow that they had missed several opportunities to buy a house they wanted because she had not transferred the €700,000 to them. They expressed further concerns because the due date of their baby was about two months away. Chow told them she would transfer the final €700,000 by the end of the month.

On August 1, Chow called the Brabners and told them she was ready to transfer the final payment. The Brabners received a signed letter from Chow dated August 1, which indicated that

Chow would transfer them a gift of €40,000. That money was transferred soon after.

On August 8, Chow sent an e-mail to the Brabners asking them to open a specially earmarked account under Tania's name alone so that she could transfer the remaining money. The Brabners did so. On August 17, Chow e-mailed the Brabners and requested that they immediately send her a copy of their passports and marriage certificate so that she could have the proper documentation to pay the U.S. gift tax on the gifts.

On August 25, 2011, Chow called the Brabners and told them she had decided to transfer them $700,000 instead of €700,000. At the time, a euro was worth approximately 1.45 U.S. dollars; €700,000 was therefore worth approximately $1,015,000.

### 7. Chow's Visit to the United States

On August 30, the Brabners picked up Chow from Logan Airport in Boston and drove her to a hotel in Marlborough where they were staying. The Brabners had paid for an adjoining room in the hotel for Chow, and also paid for a two-bedroom, one-month rental apartment in Lenox so that Chow could stay with them for a period of time.

On September 2, during a breakfast, Chow told the Brabners that she was bored with Massachusetts. She also insisted that her "Scottish ex-boyfriend Andrew from Belgium" be permitted to live with them in the apartment in Lenox. (Compl. ¶ 39). The Brabners told Chow they felt that would be inappropriate. Chow then told the Brabners that she did not have to transfer the final trust payment to them because it was her money. She also insisted that a payment of $700,000 would be too much money for them to purchase a house. Instead, she said $450,000 was enough.

While later riding with the Brabners to a restaurant for dinner, Chow pointed to a random

6

apartment complex and said they could live there if they did not want to respect her decision to have her acquaintance stay with them in the apartment in Lenox.  She also said she no longer wanted to stay with them because her life was in danger from Tod's bad driving.

That night, Chow left the hotel and flew to Los Angeles without telling the Brabners. While there, she spent time with her mother, sister, brother, and her ex-boyfriend Andrew.

### 8. Further Communication Between Chow and the Brabners

On September 5, 2011, Chow e-mailed the Brabners, saying she would give them $450,000 to help them buy a house.  She also said that the more they looked, the more the price on the house they wanted went up, and told them that their "greed has no limit."  (Compl. ¶ 40).

Between September and May 2012, the Brabners repeatedly called Chow for clarification about the exact amount of any payment and how they could collect the final payment from the trust.  Chow denied that she held any assets in trust for them, refused to provide them any information regarding the Crossroads Trust, and denied having agreed to give them any money so they could buy a house.  Instead, she said it was better for them to earn a house rather than get a house for free.  Chow offered to match whatever future money Tod earned for them to buy a house.

On May 15, 2012, the Brabners called Chow to tell her they were frustrated and upset with her because they felt she had not been honest about the trust.  In addition, they told her they were concerned about whether she had paid the gift tax on the gifts they had received.  Chow told the Brabners that if they contested her use of the Crossroads Trust, she would disappear with all the assets and they would never find her.  On May 17, Chow listed her house in Belgium for sale.

7

In an e-mail to the Brabners on May 22, 2012, Chow threatened to deduct assets from their inheritance in her will proportionate to any financial loss she incurred from them contesting her use of the Crossroads Trust. On May 23, Chow e-mailed the Brabners again and offered to give them money equal to Tod's earnings to buy a house. On May 25, Chow again e-mailed the Brabners, reiterating her position that the Crossroads Trust money was her money.

B.     **Procedural Background**

Plaintiffs filed this case *pro se* on February 19, 2013. The complaint alleges claims for fraud, breach of fiduciary duty, breach of contract, promissory estoppel, conversion, and unjust enrichment. It requests damages of at least $950,000, an order for accounting, and an order that the awarded damages be held in constructive trust until they are transferred to plaintiffs.

Defendant has moved to dismiss, contending that the Court has no personal jurisdiction over her and that the complaint fails to state a claim upon which relief can be granted.

II.    **Standard of Review**

The exercise of personal jurisdiction over a defendant must be authorized by statute and be consistent with the due process requirements of the United States Constitution. *Nowak v. Tak How Invs., Ltd.*, 93 F.2d 708, 712 (1st Cir. 1996); *Intech, Inc. v. Triple "C" Marine Salvage, Inc.*, 444 Mass. 122, 125 (2005). Furthermore,

> [a] district court may exercise authority over a defendant by virtue of either general or specific jurisdiction. Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities. General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state.

*United States v. Swiss American Bank*, 274 F.3d 610, 618 (1st Cir. 2001) (internal quotations and citations omitted).

8

The plaintiff bears the burden of showing that the court has personal jurisdiction over the defendant. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50 (1st Cir. 2002). A district court faced with a motion to dismiss under Rule 12(b)(2) may choose among several methods for determining whether the plaintiff has met its burden: the "*prima facie*" standard, the "preponderance-of-the-evidence," standard, or the "likelihood" standard. *Id.* at 50-51, 51 n.5; *Foster-Miller, Inc. v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st Cir. 1995).

Where, as here, a district court considers a motion to dismiss for lack of personal jurisdiction without first holding an evidentiary hearing, the *prima facie* standard governs its determination. *Swiss American*, 274 F.3d at 618. In conducting a *prima facie* analysis, the court is required to take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed), construing them in the light most favorable to the plaintiff; the court, however, should not credit "conclusory allegations or draw farfetched inferences." *Ticketmaster-New York v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994). The court can "add to the mix facts put forward by the defendants, to the extent that they are uncontradicted." *Daynard*, 290 F.3d at 51. Although the court will construe the facts in the light most favorable to the plaintiff in a motion to dismiss, the plaintiff still has the burden of demonstrating each jurisdictional requirement. *See Swiss American*, 274 F.3d at 618.[2]

## III.     **General Personal Jurisdiction**

General jurisdiction "exists when the litigation is not directly founded on the defendant's

---

[2] "In order to make a prima facie showing of jurisdiction, 'the plaintiff ordinarily cannot rest upon the pleadings but is obliged to adduce evidence of specific facts.'" *Phillips v. Prairie Eye Center*, 530 F.3d 22, 26 (1st Cir. 2008) (quoting *Foster-Miller*, 46 F.3d at 145). This case is unusual in that plaintiffs are proceeding *pro se*. Additionally, defendant has, for the purposes of this motion, accepted the facts alleged in plaintiffs' complaint as true. (Def. Mem. at 2 n.1). Accordingly, even though plaintiffs have proffered no evidence, the Court will accept the facts alleged in the complaint as true for the purposes of the motion to dismiss.

forum-based contacts, but the defendant has nonetheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998); *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 138-39 (1st Cir. 2006). To establish general jurisdiction, a plaintiff must meet two criteria. First, there must be "continuous and systematic general business contacts" between the foreign defendant and the forum. *Swiss American*, 274 F.3d at 618 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984)). This test "is considerably more stringent than that applied to specific jurisdiction questions." *Swiss American*, 274 F.3d at 619 (citing *Noonan v. Winston Co.*, 135 F.3d 85, 93 (1st Cir. 1998)). Second, plaintiffs must show that the "exercise of jurisdiction would be reasonable." *Swiss American*, 274 F.3d at 619. That inquiry is based on various so-called "gestalt" factors used to determine the fundamental fairness of exercising jurisdiction. *See Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990).

Plaintiffs do not appear to argue that general personal jurisdiction can be asserted over defendant. A review of the alleged contacts between plaintiffs and defendant, examined in more detail below, shows that defendant e-mailed, called, or wrote letters to plaintiffs, and defendant visited Massachusetts for four days from August 30 to September 2, 2011. These alleged contacts fall far short of the "continuous and systematic general business contacts" necessary for general personal jurisdiction to attach. *See Helicopteros Nacionales*, 466 U.S. at 416-17 (trip by defendant's CEO to negotiate contract in Texas, acceptance of checks drawn on Texas bank, and purchases of helicopters and equipment from Texas manufacturer insufficient for exercise of general personal jurisdiction).

## IV. Specific Personal Jurisdiction

"In the absence of general jurisdiction, a court's power depends upon the existence of specific jurisdiction." *Massachusetts Sch. of Law*, 142 F.3d at 34. To establish personal jurisdiction, plaintiffs "must demonstrate that the Massachusetts long-arm statute grants jurisdiction over [defendant] and that the exercise of that jurisdiction comports with the Due Process Clause of the Fifth Amendment." *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007).

### A. Massachusetts Long-Arm Statute

The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3, states in relevant part that "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . causing tortious injury by an act or omission in this commonwealth." Plaintiffs contend that although the complaint does not specifically allege a claim for tortious interference with an expected gift, it alleges facts sufficient to state such claim. Defendant contends that such a cause of action cannot be raised for the first time to defeat a Rule 12(b)(3) motion, and is inconsistent with the factual allegations in the complaint.

Plaintiffs' contention could be construed as a motion to amend the complaint to add a tortious-interference claim. *See* Fed. R. Civ. P. 15(a)(2). However, the Court need not decide this issue. "In Massachusetts, the Court can 'sidestep the statutory inquiry and proceed directly to the constitutional analysis' because the state's long-arm statute is coextensive with the limits allowed by the Constitution." *Adelson*, 510 F.3d at 49 (quoting *Daynard*, 290 F.3d at 52); *see also "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972). Under that analysis, personal jurisdiction over defendant is lacking.

11

## B. Due Process

Due process requires that a defendant over whom a Massachusetts court will exercise jurisdiction has maintained "minimum contacts" with the state "such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). For specific jurisdiction, the First Circuit has broken the minimum contacts analysis into three categories: relatedness, purposeful availment, and reasonableness. *Adelson*, 510 F.3d at 49. Plaintiffs contend that defendant's communications with them in Massachusetts, coupled with her visit in 2011, satisfy the minimum contacts analysis.

### 1. Relatedness

To satisfy the relatedness requirement, "the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *Daynard*, 290 F.3d at 60 (quoting *Foster-Miller*, 46 F.3d at 144). The complaint alleges that defendant breached a contract between her and plaintiffs (or, alternatively, became subject to a claim of promissory estoppel or violated her duties under an oral trust) when she told them, during her visit to Massachusetts, that the trust money was hers and that she would not pay them the rest of the promised €800,000. (Compl. ¶ 39). The complaint also alleges that on at least twelve separate occasions, defendant called, e-mailed, or sent letters to plaintiffs concerning the disputed funds. (Compl. ¶¶ 22-24, 28, 30, 34-37, 40, 43, 44). These communications are "unquestionably [contacts] for purposes of" the personal jurisdiction analysis. *Sawtelle v. Farrell*, 70 F.3d 1381, 1389-90 (1st Cir. 1995).

Although the oral trust itself is alleged to have been created in France more than ten years

ago, defendant's communications with plaintiffs underlie the nonpayment of the alleged trust money. In addition, defendant expressed her intention not to pay the money in person during her visit to Massachusetts. Because the failure to pay that money is the gravamen of the claims in the complaint, those alleged, although tenuous, are sufficiently related to plaintiffs' claims to satisfy the relatedness inquiry for specific personal jurisdiction. *See United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1089-90 (1st Cir. 1992) (relatedness satisfied when claim arises directly from, or is caused proximately by, defendant's contacts).

### 2. **Purposeful Availment**

A defendant's in-state contacts "must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Daynard*, 290 F.3d at 61 (quoting *Foster-Miller*, 46 F.3d at 144). "The cornerstones upon which the concept of purposeful availment rests are voluntariness and foreseeability." *Id.* (quoting *Sawtelle*, 70 F.3d at 1391). "Voluntariness requires that the defendant's contacts with the forum state 'proximately result from actions of the defendant *himself*.'" *Adams v. Adams*, 601 F.3d 1, 6 (1st Cir. 2010) (quoting *Phillips Exeter Academy v. Howard Phillips Fund*, 196 F.3d 284, 292 (1st Cir. 1999)) (emphasis in original). "The contacts must be deliberate, and 'not based on the unilateral actions of another party.'" *Id.* (quoting *Phillips*, 530 F.3d at 28). "[A] defendant's awareness of the plaintiff's state of residence is not, by itself, enough to create personal jurisdiction." *Adams*, 601 F.3d at 7.

The complaint alleges claims of (1) fraud, (2) breach of fiduciary duty, (3) breach of contract, (4) promissory estoppel, (5) conversion, and (6) unjust enrichment. All of those claims

allege in some fashion that defendant reneged on a legally enforceable promise, made in 2000, to give Tania money to buy a house. The two women were in France at the time of the alleged promise; defendant was then (and apparently remains) a resident of Belgium.[3] The claims in the complaint also allege that defendant made an "oral modification" to her original promise in 2011, and that she also reneged on that promise.

Thus, the relevant relationship between defendant and Tania—that is, the alleged contractual, promissory, or trustee/beneficiary relationship—was established in France in 2000, not in Massachusetts.[4] Defendant did, however, have contact with plaintiffs in Massachusetts beginning in 2008. The complaint, construed liberally, contains the following instances where defendant is alleged to have contacted or visited Massachusetts concerning the claims at issue in this case.

1. On December 25, 2008, defendant called plaintiffs and told them she would pay the €800,000 to them in three gift payments over the course of three years. (Compl. ¶ 22). (This was in response to a phone call on December 1, where plaintiffs called defendant and asked her how they could collect the €800,000.) (*Id.* ¶ 21).

2. Defendant made a transfer of €50,000 into the Brabners' bank account, and sent them a letter on January 16, 2009, confirming the transfer. (*Id.* ¶ 23).

3. Defendant made another transfer of €50,000 into the Brabners' bank account, and sent them a letter on March 25, 2010, confirming the transfer. (*Id.* ¶ 24).

---

[3] The complaint does not state Tod's whereabouts or his relationship with defendant before 2006, nor does it indicate Tania's place of residence in 2000.

[4] Of course, the parties had a pre-existing familial relationship, as defendant is Tania's mother.

14

4. On April 15, 2011, defendant called the plaintiffs to tell them she would transfer them €700,000. (*Id.* ¶ 28).

5. In May 2011, defendant "actively corresponded with plaintiffs [via both telephone and email] about their plans to purchase a house." (*Id.* ¶ 30 (brackets in original)).

6. On August 1, 2011, defendant again called plaintiffs to tell them she was ready to transfer them a "final payment." (*Id.* ¶ 34). (This was in response to e-mails from plaintiffs asking for her to send them that money.) (*Id.* ¶¶ 32-33).

7. On August 8, 2011, defendant sent an e-mail to plaintiffs asking Tania Brabner to open a special bank account so defendant could send them the money they requested. (*Id.* ¶ 35).

8. On August 17, 2011, defendant sent an e-mail to plaintiffs requesting that they fax her a copy of their passport and marriage certificate to her. (*Id.* ¶ 36). (This was so defendant could send plaintiffs the money they requested.) (*Id.* ¶¶ 32-33, 36).

9. On August 25, 2011, defendant called plaintiffs and told them she had decided to transfer them $700,000 instead of €700,000. (*Id.* ¶ 37).

10. From August 30 to September 2, 2011, defendant visited plaintiffs in Massachusetts. (*Id.* ¶¶ 38-39). While she was there, she told them she would not pay them the money. (*Id.* ¶ 39).

11. On September 5, 2011, defendant sent an e-mail to plaintiffs stating that their "greed has no limit." (*Id.* ¶ 40).

12. On May 22, 2012, defendant e-mailed plaintiffs, threatening to deduct assets from Tania Brabner's inheritance. (*Id.* ¶ 43). (This was in response to a phone call

from plaintiffs on May 15, 2012, expressing their frustration regarding the disputed money.) (*Id.* ¶ 42).

13. On May 23, 2012, defendant e-mailed the plaintiffs, offering to send them money equal to what Tod Brabner earned. (*Id.* ¶ 44). (This was a further response to plaintiffs' May 15 phone call.)

In order for personal jurisdiction to attach, there must be evidence that the defendant voluntarily reached into the jurisdiction. *Daynard*, 290 F.3d at 61. Those contacts must be proximately caused by the defendant, and not the plaintiffs or a third party. *Adams*, 601 F.3d at 7. Many of defendant's alleged contacts with Massachusetts (at least nine of the thirteen) were made in response to communications from plaintiffs. Those contacts, without more, do not support the exercise of jurisdiction in this case.

In addition, "the relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state." *Phillips Exeter*, 196 F.3d at 290 (quoting *Sawtelle*, 70 F.3d at 1389). For example, personal jurisdiction may attach where the defendant initiates the transaction and the defendant contemplates that the plaintiff will render services to the plaintiff in the forum state. *Daynard*, 290 F.3d at 62.

Here, defendant did not visit or send communications into Massachusetts for any reason other than because plaintiffs happened to be there. The relevant financial relationship had been established outside of Massachusetts.

"Without evidence that the defendant actually reached out to the plaintiff's state of residence to *create* a relationship—say, by solicitation—the mere fact that the defendant willingly entered into a tendered relationship does not carry the day." *Phillips Exeter*, 196 F.3d

at 292 (internal citation omitted). Defendant's alleged contacts with Massachusetts arising out of the relationship she had with plaintiffs established outside the jurisdiction are not sufficient to show she purposefully availed herself of the laws of the forum. *See id.* at 290; *Zuraitis v. Kimberden, Inc.*, 2008 WL 142773, at *3 (Mass. Super. Jan. 2, 2008) (no personal jurisdiction where plaintiff was a Massachusetts resident, plaintiff paid for a horse in Florida, phone calls and faxes were exchanged between plaintiff and defendant while plaintiff was in Massachusetts, and defendant sent the wrong horse to Massachusetts).[5]

Under the circumstances, the exercise of jurisdiction over defendant would not be consistent with the requirements of due process. Accordingly, defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(2) will be granted.[6]

## **VI.** **Conclusion**

For the foregoing reasons, defendant's motion to dismiss for lack of personal jurisdiction is GRANTED.

**So Ordered.**

Dated: April 9, 2014

/s/ F. Dennis Saylor  
F. Dennis Saylor IV  
United States District Judge

---

[5] The Court does not decide whether it would be reasonable under the Due Process Clause to exercise personal jurisdiction over defendant in Massachusetts. *See Adams*, 601 F.3d at 8 (declining to conduct reasonableness analysis after finding insufficient evidence of purposeful availment); *Phillips Exeter*, 196 F.3d at 292 (the same).

[6] The Court reaches no issues other than those addressed in this opinion.